USCA1 Opinion

 

  ____________________ No. 96-2123 UNITED STATES OF AMERICA, Appellee, v. KENNETH LEON MEADER, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Coffin, Senior Circuit Judge, and Lynch, Circuit Judge. ____________________ David  M.  Sanders, by Appointment of the Court, for appellant. Margaret  D.  McGaughey, Assistant United States Attorney, with whom  Jay  P.  McCloskey, United States Attorney, and Gail F. Malone, Assistant United States Attorney, were on brief for appellee. ____________________ July 11, 1997 ___________________ COFFIN, Senior Circuit Judge. Appellant Kenneth Leon Meader was convicted on all three counts of an indictment charging him with distributing cocaine, using a firearm in connection with a drug trafficking crime, and being a felon-in-possession of a firearm.   He  essentially  raises two claims on appeal, one involving possible juror bias and the other concerning his sentencing as a career criminal based on prior convictions for unlawful sexual contact and intercourse with a minor. After careful review, we affirm. I. Factual Background The  facts  of  the  crime  are largely irrelevant to the issues we face  on  appeal, and we therefore do not recite them in any detail. It suffices to say that, viewing the evidence in the light most favorable to the prosecution, the jury could have found that appellant  abducted  the  mother of his young son at gunpoint from her parents'  home,  took  her  to the house they had shared, forced her to ingest  cocaine and sleeping pills, and assaulted her sexually. He eventually released her, and surrendered to authorities.  The jury returned its guilty verdicts on March 27, 1996. On April 19, defense counsel advised the court that he had received information about a juror that suggested that she possibly was biased. A defense witness, Decato, had spoken with the juror's son, who reported that his mother had a history of abusive relationships and consequently was "dead set against" domestic abusers.   The  son  also  told Decato that once his mother made up her mind she would not change it. -2- Before trial, Meader had submitted six proposed voir dire questions, four of which pertained to domestic abuse.1 The court reframed them into a single question: There  may  be  evidence in this case concerning a domestic relationship in which physical force or abuse was involved or threatened. Does any member of the panel have personal views or personal experiences that would prevent you from deciding this type of case fairly and impartially? No juror responded. In  a  conference with counsel following revelation of Decato's conversation, the district court identified two issues: did the juror  prejudge the case, and did she answer the voir dire question falsely?   Attempting to adhere to First Circuit authority strongly disfavoring direct contact with jurors, see United States v. Kepreos ,  759  F.2d  961,  967 (1st Cir. 1985), the court determined to hear testimony first from Decato, then from the juror's son, and, only  if  questions remained, from the juror. Further reflection by both  court  and  counsel  following Decato's testimony and a review of the voir dire transcript led, however, to a decision to hear directly from the juror rather than her son. 1 The four questions proposed by Meader on the issue of domestic violence were as follows: 1. Have you been involved in a domestic relationship in which physical force or abuse was involved? 2. Has a relative of yours, or a close friend been involved in a domestic relationship in which physical force was used, or was claimed to have been used? 3. Have you been involved in a domestic relationship in which  the  threat  of  physical force or abuse was involved? 4. Has a relative of yours, or a close friend been involved in a domestic relationship in which the threat of physical force or abuse was used, or claimed to have been used? -3- The  juror,  Sandra Petersen, was questioned by the court in an informal session. Both counsel were present and had submitted proposed  questions, but they were asked to remain at the periphery of the proceeding "to maintain a certain level of informality." Juror Petersen acknowledged that she had been emotionally and verbally abused by an ex-husband, and that her son had been physically abused by the same man. She further acknowledged that she does not like abusers, but emphatically rejected her son's suggestion to Decato that she had her mind made up about the case before its conclusion. She responded to the court's question on that point as follows: What? No way. No way. He -- he must have fabricated that because no way. No, I -- in fact, I told him that it  would  take  awhile  for  me to -- to come to the decision because  it's  a  man's  life is what I said. And that's the way I feel about any case. You know, I'm -- I've got a man's life here in my hands. There's no way I -- no. In  response  to  her  son's  comment that "my mother doesn't change her mind once it's set," she explained that that was the way she handled him -- "if I tell him this is it, that's all" -- and that she viewed his statement as an attempt "to pump himself up, make himself look big" because his mother was a juror for the trial. Asked  if  her  views had any impact on the trial, the juror replied: I retarded everyone else in the deliberation because I had  a  life  in my hand and I did not know, you know, if I should go along with everybody else. Everyone else was going towards guilty. I was not. Because I waited until,  you  know, I heard more about it and more evidence and,  you  know, we deliberated before I finally said yes. When the court asked if her experiences with her ex-husband affected her attitude toward the trial, she answered: -4- It did in a way because I had to really think out the case and say, you know, is this -- you know, is there abuse here or is it that this man has a -- a mental problem  .  .  . I know a little bit about the psychic mind and how it works. And sometimes when you're under an awful  lot  of  stress  you  will do things on the spur of the moment. But the other jurors made me see that this was premeditated, he thought it out before he -- he actually did the crime. Additionally, when asked specifically whether her experiences affected  her  fairness or impartiality, the juror replied: "I think I was very fair because I thought it all out . . . . I wouldn't make a judgment on someone unless I really thought something out. And  I  wouldn't let my own personal feelings interfere in any way." She repeated that sentiment when asked whether her personal views made her more or less sympathetic to either the government or the defense: "I went by what was on the table . . . . I put my own feelings aside." Based on this inquiry, the court tentatively concluded that neither predisposition nor outside factors influenced the jury's verdict, but also asked for briefs from counsel. The court rejected  defense  counsel's request that the court also question the juror's son, noting the First Circuit's reluctance to probe into the jury process unless absolutely necessary. On  June  14,  1996, three weeks after the court's exchange with the juror, Meader moved for a mistrial. He claimed both that the court  should  have  used  his proposed voir dire questions, instead of the court's modification, and that additional investigation into juror bias was necessary. -5- The  district  court denied the motion in a thoughtful ten-page order,  and  we here provide only a summary of its contents. First, the court found no suggestion of prejudice, observing that the juror's answers -- which the court found "logical and believable" -- "reveal that, if anything, she gave this defendant the benefit of the doubt." On Meader's claim that his voir dire questions should have been asked, the court noted that no objection was raised to the questions actually posed and no requests for additional questions were made at the time of the voir dire. The claim therefore was waived. Responding to Meader's attack on the adequacy of the investigation into bias, the court noted the need to avoid undue intrusion into jurors' lives, and stated that testimony from the juror's son was unnecessary because the court had credited Decato's testimony about what the son told him, even though Decato had reason to testify so as to make a mistrial more likely.  The court sentenced Meader to 120 months in prison on Count One (felon-in-possession), to be served concurrently with a 360- month term on Count Two (distribution of cocaine). A 60-month consecutive term, as required by statute, would follow on Count Three (use of firearm in drug trafficking crime). The penalties reflected increases for various specific characteristics of the offenses, including the abduction of the victim, commission of criminal  sexual abuse, and use of force and threats of death. The penalty  also  reflected Meader's status as a career offender, based on his having two prior convictions for drug or violent crimes. -6- On  appeal,  Meader challenges the district court's handling of the voir dire and the allegations of juror bias, both relating to the domestic abuse issue. He also claims that his prior convictions  for  statutory rape and unlawful sexual contact were not crimes of violence and thus should not have been used to classify him as a career offender. II. Domestic Abuse: Voir Dire and Juror Bias A. Voir Dire. We need not dwell on the district court's failure  to  ask  verbatim  Meader's proposed voir dire questions. The court had no obligation to ask the questions in the specific language  proposed, see United States v. Victoria-Peguero, 920 F.2d 77, 84 (1st Cir. 1990), and counsel's acquiescence in the court's reframed  question means that any objection to that formulation was not preserved for appeal. See United States v. Walsh, 75 F.3d 1, 6 (1st Cir. 1996) ("[T]he usual rule is that an objection must be made  known  at  the  time  that the court is making its decision to act .  .  .  .").   Because the district court's inquiry -- asking whether jurors could impartially judge a case involving domestic violence -- directly focused on the critical concern of bias, we are persuaded beyond any doubt that no plain error occurred. In so concluding, we offer no view of the substance of Meader's complaint. He contends that the court's voir dire question,  allowing jurors who were exposed to domestic violence to reveal their experiences only if they felt such exposure would impact their jury service, deprived him of the ability to use his challenges  effectively. Although this position has some force, we -7- decline  to  consider  whether, in other circumstances, the failure to pose more discerning questions would be reversible error. B. Juror Bias. Meader also challenges the district court's approach and conclusion with respect to the possible bias of one juror.   He  particularly  complains about the court's failure to hear testimony from the juror's son and its prohibiting the defendant from  either  directly contacting the son or sending an investigator to  interview  him. Meader asserts that this limitation on the bias inquiry prevented him from effectively challenging the juror's "self-serving statements . . . that she could and did put her feelings about domestic abuse aside in deciding this case." Our caselaw holds that a district court is obliged to investigate plausible allegations of improper influence on a jury verdict, see, e.g., Walsh, 75 F.3d at 6-7; United States v. Hunnewell, 891 F.2d 955, 961 (1st Cir. 1989), but that the court has  "broad  discretion to determine the type of investigation which must be mounted," United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990); see also Walsh, 75 F.3d at 7. In this case, the court's process was a textbook model of conscientiousness, and so far from an abuse of discretion that it is difficult to take Meader's complaint seriously. The  court  promptly  conferred with counsel about how to proceed when alerted to the possible juror taint, it ordered a transcript of the jury selection process so that it could accurately review the new information in light of what previously had occurred, it heard testimony from the witness who had brought the juror's -8- possible bias to the defendant's attention, and it discussed with the parties how best to proceed in keeping with both the First Circuit's  admonition  against unnecessary juror contact and the need to ferret out the juror's true attitudes. Indeed, the court overcame  its  reluctance  to question the juror directly in deference to defendant's preference. The process of questioning the juror also was marked by commendable attention to the various interests at stake. So that the juror would not be unduly alarmed or prepare ahead for questioning  on the bias issue, she was asked to appear in court by means of a regular jury summons. The attorneys were given the opportunity  to submit questions to the court, but were kept on the sidelines  during  the  actual questioning to contain the formality of the proceeding. After completing the preliminary questions, the court excused the juror and consulted with counsel about possible additional  areas of inquiry. Its rejection of defendant's request to question the son as well, or to allow him to be questioned by investigators, was carefully considered and supportable.2 Its 2 On this point, the court wrote, in substantial part: First, I am crediting the account of Mr. Decato -- the defendant's employee, witness and boyfriend of his daughter  --  as to what the young man said to Mr. Decato. . . . Second, now that I have interviewed the juror and she is fully aware that her son is the cause of the inquiry, I am concerned that to bring her son in by subpoena  or  to  send  an  FBI agent and private investigator to interview him (as was proposed by the lawyers) would unnecessarily increase the juror's apprehension and concern that her son is now in trouble notwithstanding her explanation of what took place. Third, to pursue from her son things that the juror may or may not have said to him would be embarking on a fishing expedition -9- substantial written opinion fully explained the basis of its conclusions.  Nor is the court's finding that the juror was not prejudicially biased assailable. The dialogue between the court and  the  juror  recounted  above reveals that the juror understood her obligation to keep her own subjective, though related, feelings outside of the deliberation process, and that, as the court observed, she gave the defendant "the benefit of the doubt." Assessment of the juror's credibility as she responded to the questioning is uniquely the domain of the district court, and, to borrow the government's language, her "clear, responsive, and forthright responses provided ample reason to credit her assertions." Thus, we find no basis connected to the court's handling of the domestic abuse issue upon which to disturb the jury's verdicts.3 contrary to the admonitions of the appellate courts to keep the jury process and the jurors themselves free of unnecessary intrusions. Finally, any interview I might conduct of the son now would clearly be preceded by a frank and candid discussion between juror and son, thereby making any such interview of limited value. Order at 4-5.     3  We  find no merit in Meader's additional suggestion that the jury as a whole engaged in misconduct by deliberating before the conclusion of all the evidence. The district court's response to this contention in its Order was both adequate and appropriate. See Order at 9-10. -10- III. Career Offender Status Meader  claims that the district court erred in sentencing him as a career offender under U.S.S.G. S 4B1.1, which provides for enhanced sentences if a defendant's criminal history satisfies three criteria: (1) he was at least 18 years old at the time he committed the offense for which he is being sentenced; (2) that offense  is  a  felony that either constituted a crime of violence or a  controlled  substance offense; and (3) the defendant has at least two prior felony convictions for either crimes of violence or crimes involving controlled substances. Meader concedes most of these requirements, including one of the two necessary "predicate offenses."4 The only issue in dispute is whether his criminal history includes a second such offense. The  district  court  based  its finding of career offender status on two 1988 Maine convictions for statutory rape and unlawful sexual  contact  with  a  child under the age of fourteen, finding that they qualified as "crimes of violence" within the meaning of the guidelines.5 Meader contends that neither was properly counted. The issue is one of law, and our review is therefore de novo. United States v. Winter, 22 F.3d 15, 18 (1st Cir. 1994). 4 Meader does not dispute that his 1982 conviction for the sale of narcotics constitutes such an offense. 5 At some points during the sentencing hearing, the district court seemed to deal with the two offenses as one, and its "crime of violence" determination seemed to apply only to the statutory rape conviction. Whether or not the court meant its ruling to include  both  convictions  does not matter for purposes of this case, however, since only one additional offense is needed to trigger career offender status.  -11- A "crime of violence" under the guidelines is any state or federal offense punishable by a year or more in prison that (i) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (ii) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another. U.S.S.G. S 4B1.2(1). Application note 2 to the provision elaborates on the meaning of "crime of violence" by listing additional crimes that fall within its scope, including murder, manslaughter, kidnapping, and forcible sex offenses. Because neither of the two Maine sexual offenses includes as an element the use or threat of physical force,6 it is undisputed that in order to qualify as "crimes of violence" they must fall under  the  "otherwise" clause of S 4B1.2, and therefore be offenses that present "a serious potential risk of physical injury." The district court, noting that the requisite risk is of any physical injury, found that "there is a strong likelihood of some physical injury,  however minor the injury might be in the range of possible physical injuries that can happen to a human body in sexual intercourse  with  a  13-year-old female." The court drew support for its  conclusion from a Maine Supreme Court case, State v. Rundlett, 6 The two offenses were denominated as rape, Me. Rev. Stat. Ann. tit. 17-A, S 252, and unlawful sexual contact, id. at S 255. The conviction for rape required the jury to find only that the defendant had engaged in sexual intercourse with another person, not his spouse, who was not yet fourteen. The conviction for unlawful sexual contact similarly required a finding that the defendant had subjected another person, not his spouse, to sexual contact when that other person was not yet fourteen and he was at least three years older. -12- 391 A.2d 815 (1978), that linked passage of the state's statutory rape provision to a concern about physical injury to young girls, id. d medical literature on injuries caused to young adolescent females by sexual intercourse with adult males.7 Thus, combining its own perceptions with this precedent and supporting material, the district court held that the Maine convictions triggered career offender status. M  at  819,  and  that  cite eader  takes  issue  with  this finding on multiple fronts. His primary argument is that the district court failed to follow the well  established "categorical" approach for deciding the "crime of violence"  issue, see, e.g., Winter, 22 F.3d at 18, and that, if it had,  its  conclusion would have been different. He emphasizes that the rape statute embraces a wide variety of consensual acts, including  those between two individuals who are both under the age of fourteen, and imposes liability without culpability. Consequently, he asserts, many, if not most, circumstances of statutory rape would not involve a likelihood of the sort of accompanying violence that was targeted by the career offender guideline. Therefore, viewed from a categorical perspective, he maintains  that statutory rape under Maine law cannot be classified as a crime of violence.  The sentencing court's inquiry is not as confined as Meader posits  it  to  be. Meader is correct that the standard approach for 7 Quoting from a 1977 article in a clinical obstetrics and gynecological journal, the Maine court reported: "'These injuries are most frequently minor and include abrasions, hymenal transections, first-degree vaginal tears, and perianal tears.'" State v. Rundlett, 391 A.2d 815, 819 (1978). -13- determining whether a particular crime fits within the "crime of violence" rubric is a generic one, in which inquiry is restricted t ory definitions of the prior offenses, without regard the particular facts underlying them, see Taylor v. United States, 495 U.S. 575, 600 (1990);8 Winter, 22 F.3d at 18; United States v. DeJesus, 984 F.2d 21, 23 (1st Cir. 1993) ("formal categorical  approach  .  .  . is the method of choice" for determining "crime  of  violence"). Thus, in United States v. Doe, 960 F.2d 221 (1st Cir. 1992), we concluded that the crime of being a felon in possession of a firearm was not a crime of violence despite the o  the  statut to fact  that  the defendant in that case possessed the gun while lying in  wait  for  an enemy to come out of a restaurant. This conclusion was warranted under the formal categorical approach, we held, because the conduct that typically constitutes firearm possession (keeping a gun in a closet, a car, a pocket) is not likely to include accompanying violence. Id. at 224-25. Application Note 2 to guideline section 4B1.2, however, explicitly  identifies the defendant's charged conduct, rather than 8 Taylor involved the definition of a "violent felony" for purposes of the Armed Career Criminal Act (ACCA), 18 U.S.C. S 924(e), which we have noted is "the same in all material respects as the definition of a 'crime of violence' for purposes of the sentencing guidelines' career offender provision." United States v.  Bell ,  966  F.2d 703, 704 (1st Cir. 1992). Given the similarity, "authority interpreting one phrase frequently is found to be persuasive in interpreting the other phrase," United States v. Winter ,  22  F.3d  15,  18  n.3 (1st Cir. 1994). See also United States v.  Fiore ,  983  F.2d  1,  4  (1st Cir. 1992) (relying in career offender context  on  interpretation of ACCA's "identically worded 'otherwise' clause" because the two contexts represent "a distinction without a  difference").   Accord  U nited States v. Wood, 52 F.3d 272, 275 n.2 (9th Cir. 1995). -14- the general offense category, as the focus of the "otherwise" c See o  "the  conduct  set  forth i.e., expressly charged) in the count of which  the  defendant was convicted"). The district court therefore was explicitly authorized to review the charging papers.9 Meader's focus on a categorical analysis is not entirely off the mark, however, because even when inquiry beyond the statutory language is appropriate, we have held that the scrutiny should remain  categorical  rather than become fact-specific, see Winter, 22 F.3d at 19: [T]he court should not plunge into the details of a particular  defendant's conduct, but, rather . . . should merely assess the nature . . . of the . . . activity as described in the indictment and fleshed out in the jury instructions. cord United States v.  lause.    U.S.S.G. S 4B1.2, comment. (n.2) (directing attention t ( Ac Wood, 52 F.3d 272, 275 (9th Cir. 1995). This is what the district court did. Using only the facts     9  A  second basis for looking beyond the statutory language is Taylor v. United States, 495 U.S. 575, 602 (1990), where the  Supreme  Court carved out a narrow exception to the categorical found in  approach for cases in which the statute of conviction covers conduct  both  inside  and  outside the "crime of violence" sphere. In such  instances,  the  sentencing court may look to the information or indictment and jury instructions to ascertain whether the conduct that was the basis for the conviction constituted a crime of violence. See Winter, 22 F.3d at 18; United States v. Doe, 960 F.2d 221, 224 (1st Cir. 1992). Here, for example, where the statute  of  conviction covers a wide range of sexual crimes -- from an adult's violent rape of a child to the consensual sexual intercourse  of  two  teenagers -- it was permissible under Taylor for the district court to review the charging papers and jury instructions to determine whether the jury in deciding to convict "necessarily  had  to  find" force, see Taylor, 495 U.S. at 602, which would bring the conviction directly within the list of qualifying crimes contained in the Application Note. See U.S.S.G. S 4B1.2, comment.  (n.2)  (identifying "forcible sexual offenses" as crimes of violence). There was, however, no allegation in the indictment, and thus no jury finding, of force. -15- contained  in  the indictment, the court identified the issue before it as "whether sexual intercourse with a 13-year-old female or sexual touching of a 13-year-old female by a 36-year-old male . . . 'by its nature presented a serious potential risk of physical injury' to the 13-year-old female." This  careful  articulation of the question provides the target for Meader's second-tier assault on the court's methodology. He argues  that,  assuming the court acted properly in referring at all to the indictment, it was improper to rely on factors as specific as the victim's gender and the age disparity between the two individuals.   He  points  out that the statute is gender neutral, and that the specific age difference was irrelevant to the conviction (beyond  the  three-year  gap required by the sexual contact offense). Focusing  too  narrowly, Meader contends, will inject disparity back into the sentencing procedure, undermining the rationale of consistency that supports the categorical approach. In Meader's view, therefore, once scrutiny of the charging papers revealed no allegation of force, a categorical analysis required the conclusion that this conviction was not a violent crime within the meaning of the Guidelines. He emphasizes that this result is consistent with the intent of the Sentencing Commission,  which  listed  sexual offenses as crimes of violence only when  they  were "forcible." See supra at 12. Indeed, he maintains that  using  a  conviction for underage sexual relations without that requirement "runs contrary to the stated purpose of the act, to focus law enforcement efforts on 'those who commit a large number -16- of fairly serious crimes as their means of livelihood.' Appellant's Brief at 45 (citing , 495 U.S. at 587). e  do  not  accept  the  prop " Taylor W osition that the guidelines permit no more refined scrutiny than an examination of whether the charging documents  (or jury instructions) include an explicit allegation of force.   The  question for the sentencing court here was whether the defendant's conduct, by its nature, posed a serious risk of physical injury. Although the use of force in virtually every instance could be expected to create a serious risk of injury, it is not the only way in which the guideline standard could be met. The age of the girl and the chronological gap between her and the defendant were crucial facts that framed the nature of the crime, and were relevant to the question of injury.10 Other circuits have treated the issue in similar fashion, linking  their determinations that sexual contact with a minor is a crime of violence to the specific age of the victim. See, e.g., United  States v. Shannon, 110 F.3d 382, 388-89 (7th Cir. 1997) (en banc) (limiting holding to thirteen-year-olds and younger, though statute  applied  to  persons under the age of sixteen); Wood, 52 F.3d at 275 (accepting government argument that "anytime an adult engages in sexual contact with a four year old child, there is 10 We recognize that the specific age disparity is stated in the unlawful sexual contact count, not in the rape count. Since, however, the court clearly had justification in considering the disparity in the sexual contact count and the jury found guilt on both  counts,  our  inquiry  need reach no farther. Moreover, it would be excessively artificial to require a court to overlook the indictment information relating to one count which so clearly increases its understanding of the nature of the statutory rape charged in the other count. -17- always  a  serious  potential risk of physical injury"); United States Rodriguez 11 license to focus at that level of particularity seems inherent in the  sentencing  court's  authority to evaluate the conduct "expressly charged."  Having  approved the district court's procedure, we can easily endorse  its  conclusion. If commonsense is inadequate to establish that there is a strong likelihood of some physical injury when a thirteen-year-old girl has sexual intercourse with a man nearly three times her age, the medical literature cited by the Maine Supreme Court substantiating that view completes the support.12 11 Rodriguez involved enhanced punishment for illegal entr v. , 979 F.2d 138, 140 (8th Cir. 1992) (involving lascivious acts with children "of the tender age of ten"). The  into the United States by a deported alien who had been convicted o ence that are defined somewhat differently y f  certain  crimes  of  viol from the career offender context; rather than involving a substantial risk of physical injury, a crime of violence in this immigration setting must involve a substantial risk of physical force. See U.S.S.G. S 2L1.2(b)(2) & 18 U.S.C. S 16.     12  We  find unpersuasive Meader's argument that the Sentencing Commission could not have intended convictions for statutory rape to trigger career offender status, if they did not involve an element  of  force, because they do not reflect the sort of longterm commitment  to  crime  that  the career offender guideline was designed to punish. See generally Taylor, 495 U.S. at 587 (enhancement provision in ACCA focused on "those who commit a large number of fairly serious crimes as their means of livelihood"). First, the language of the "otherwise" clause is broadly written, presumably to ensure capture of any crime posing a serious risk of physical injury. Second, a criminal history that satisfies the career offender requirements by means of any crime serious enough to possibly  cause  injury  to  a person is not, in our view, inconsistent with the objective of the guideline to punish more heavily those who commit serious crimes and also have a significant criminal history.  -18- We  recognize  in so deciding that we have bypassed a number of troubling  and  complex  iss the conduct charged -- could be classified as a crime of violence the e considered to pose a "serious potential risk of physical injury" for  a  minor.13   Indeed,  even determining what is meant by "physical injury" is a task fraught with complexity, as evidenced by the contrasting views of the Seventh Circuit judges in Shannon, 110 F.3d at 388-90.14 These are issues that we believe courts, and particularly s appeals courts, have neither the expertise nor the authority to  ues that would need to be addressed before tatutory  rape  at  its  mos i.e., regardless of for federal sentencing purposes. Perhaps foremost among them i standard age below which sexual intercourse typically may b 13 s t categorical level --  If statutory rape is to be classified generically as a crime of violence for purposes of the federal sentencing guidelines,  the  actionable age should be the same regardless of the state in which the crime occurred. Yet, in a recent decision on whether to classify statutory rape as a crime of violence, the Seventh  Circuit, sitting en banc, reported that states vary widely in setting the age above which sex with a minor is not made felonious,  in  the  absence of aggravating circumstances. See United States  v.  Shannon ,  110  F.3d 382, 386 (7th Cir. 1997) (en banc). In Illinois, for example, the age is seventeen; in Wisconsin, it is sixteen; in Pennsylvania, it is thirteen. Moreover, not all such statutes  are  justified by the risk of physical injury. Id. As we indicate below, these inconsistencies call for action at a policymaking level.  14 In holding that the sexual assault by an almost eighteen- year-old against an almost fourteen-year-old was a crime of violence, the majority of the en banc court focused primarily on the risk of pregnancy or disease. 110 F.3d at 388. In a concurrence, Judge Manion, joined by Judge Kanne, stated his view that  "the  risk  of  physical injury referred to in the Guideline must be confined to the act of intercourse, not the possible consequences  that  could  develop, such as pregnancy or disease." Id. at 390.  -19- resolve  in  the first instance,15 of cases in this area, should be handled expeditiously b Meader argues that, in the meantime, we should invoke courts deciding that sexual offenses involving minors and that, in light of the growing number y the Sentencing Commission and Congress. Accord Shannon, 110 F.3d at 389.16      Some   be classified as crimes of violence have framed their holdings broadly, however, notwithstanding the lack of supporting data. , e.g., United States v. Velazquez-Overa, 100 F.3d 418, 422 (5th Cir. 1996) (Texas offense of sexual contact with a child under 17 is a crime of violence within the meaning of 18 U.S.C. S 16); United States v. Reyes-Castro, 13 F.3d 377, 379 (10th Cir. should 15 See 1993) (holding that sexual abuse of a child is crime of violence within meaning of 18 U.S.C. S 16 because "when an older person attempts  to  sexually  touch a child under the age of fourteen, there is always a substantial risk that physical force will be used to ensure the child's compliance"); United States v. Bauer, 990 F.2d 373, 375 (8th Cir. 1993) (per curiam) (holding generally that sexual intercourse with a female child under 16 is a crime of violence). It should be noted that the first two cases involved the  definition of "crime of violence" contained in 18 U.S.C. S 16, focusing  on  the  risk  of  physical force rather than physical injury. The third case, Bauer, is a brief per curiam that relied almost entirely  on  the  Eighth  Circuit's earlier decision in Rodriguez, 979 F.2d at 140, which was more circumscribed (question of first impression whether commission of lascivious acts with a child, in the manner Rodriguez admits he committed the crime, qualifies as crime of violence). Other courts, as noted earlier, have referred to the defendant's specific conduct and/or focused on the minor's age in reaching their conclusions. See, e.g., United States v. Shannon, 110 F.3d 382, 389 (7th Cir. 1997) (en banc) (sexual intercourse with a 13-year-old is a crime of violence; statute criminalized sexual contact or intercourse with child under 16); United States v. Taylor, 98 F.3d 768, 773-74 (3d Cir. 1996) (holding that indecent exposure was crime of violence based on facts alleged in indictment showing that victim was "forced onto a bed and restrained while [defendant] commit[ted] a sexual act upon her"); Wood, 52 F.3d at 275 (sexual contact with a four-year-old always poses serious risk of violence). 16 In Shannon, the en banc Seventh Circuit, in reversing the panel's 2-1 ruling that the district court had erred in enhancing the  defendant's sentence based on a previous conviction for sexual assault,  recognized the difficulty of the issue and observed "[w]e cannot  be  certain that we have gotten it right." 110 F.3d at 389. The panel majority had emphasized the fact that the prior crime involved intercourse between two teenagers, the 17-year-old -20- the  rule  of  lenity  to  exclude his conviction from predicate offense It is unnecessary to do so. Whatever the dividing line betw status. een sexual offenses that constitute crimes of violence and those that do not, we are confident that the circumstances here fall well within the "crime of violence" category.  We therefore hold that, because defendant's conviction under Maine's  statutory  rape  law involved conduct that created a "serious potential risk of physical injury to another," that offense qualifies as a crime of violence under the federal sentencing guidelines. Meader thus having two such convictions, he properly was sentenced as a career offender. Affirmed.  defendant and a 13-year-old girl, and stated that such conduct between  two  minors cannot automatically be deemed violent. See 94 F.3d 1065, 1072 (7th Cir. 1996). -21-