UNITED STATES of America, Appellant,

v.

**Howard T. WINTER, Defendant, Appellee.**

No. 93–1769.

United States Court of Appeals, First Circuit.

Heard Feb. 10, 1994.

Decided April 25, 1994.

Fred M. Wyshak, Jr., Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., Boston, MA, was on brief, for appellant.

Richard M. Egbert, Boston, MA, with whom MaryEllen Kelleher, New Bedford, MA, was on brief, for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

■ It is common wisdom that the past is prologue, foreshadowing the future. When convicted criminals rise to be sentenced in a federal court, the career offender guideline, U.S.S.G. § 4B1.1, imbues that aphorism with a special meaning.[1] In such a setting, however, all past crimes are not regarded as equal; the guideline is fueled only by previous felony convictions for crimes of violence and controlled substance offenses. *See id.*

The case before us requires that we determine whether particular convictions attributable to certain racketeering activities constitute crimes of violence within the purview of this guideline. Because we agree with the district court that they do not, we affirm the sentence imposed below, 826 F.Supp. 33.

## I.

### Travel of the Case

On May 17, 1993, defendant-appellee Howard T. Winter pleaded guilty to one count of conspiracy to possess cocaine with intent to distribute, *see* 21 U.S.C. § 841(a)(1), and five counts of aiding and abetting the same offense, *see* 18 U.S.C. § 2. The district court, which had ruled out the career offender guideline during a special pre-plea hearing, imposed a ten-year incarcerative sentence.

It is undisputed that, had the court employed the career offender guideline, a significantly greater sentence would have been mandated.

The government appeals pursuant to 18 U.S.C. § 3742(b)(2).

## II.

### The Problem

■ Under the sentencing guidelines, career offender status attaches if (1) the defendant achieved the age of majority before committing the offense of conviction, (2) that offense is a felony which can itself be characterized as either a crime of violence or controlled substance offense, and (3) the defendant's criminal history reflects a minimum of two prior felony convictions (known colloquially as "predicate offenses") for either crimes of violence or crimes involving controlled substances. *See* U.S.S.G. § 4B1.1. In this case, defendant concedes that most—but not all—of these preconditions obtain: he committed the offense of conviction more than four decades after turning eighteen; that offense is a controlled substance offense; and he labors under the burden of a prior conviction for extortion—a crime that is considered a crime of violence, *see United States v. DeLuca*, 17 F.3d 6, 7–9 (1st Cir.1994); *see also* U.S.S.G. § 4B1.2(1)(ii) (enumerating certain crimes of violence and listing extortion as one of them).

The nub of the case is the defendant's insistence that his prior criminal history does not include a second predicate offense. In the court below, the government nominated a candidate to fill out the slate—a racketeering indictment that resulted in defendant's conviction in 1979, after trial, for an amalgam of offenses, namely, engaging in racketeering activity (horse race fixing), *see* 18 U.S.C. § 1962(c), conspiracy to engage in such activity, *see* 18 U.S.C. § 1962(d), sports bribery, *see* 18 U.S.C. § 224, and travel in aid of racketeering (horse race fixing), *see* 18

---

1. The November 1992 edition of the guidelines applies in this case. *See United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990) (explaining that the guidelines in effect at the time of sentencing control unless ex post facto considerations prohibit their use). Hence, all references herein are to that edition.

U.S.C. § 1952(a).[2] The lower court did not think the government's candidate qualified for election to the "crime of violence" ranks, notwithstanding the government's claim that strong-arm tactics were standard fare in the racketeering and racketeering-related activities over which Winter presided. Consequently, the court decreed that, for want of a second predicate offense, the career offender guideline did not pertain.

■ The instant appeal turns on the appropriateness of categorizing at least one of the 1979 offenses as a crime of violence. Whether a conviction for a particular type of crime qualifies as a predicate offense presents a purely legal question, sparking *de novo* review. *See United States v. De Jesus*, 984 F.2d 21, 23 n. 4 (1st Cir.1993); *United States v. Fiore*, 983 F.2d 1, 2 (1st Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 1830, 123 L.Ed.2d 458 (1993).

### III.

### *Crimes of Violence*

To constitute a crime of violence, a felony must fit into one of several pigeonholes. To be specific, a crime of violence is any state or federal offense punishable by more than one year in prison that (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another," U.S.S.G. § 4B1.2(1)(i), or (2) reposes on a short list of specially enumerated crimes such as "burglary of a dwelling, arson, or extortion," U.S.S.G. § 4B1.2(1)(ii), or (3) "involves use of explosives," *id.*, or (4) "otherwise involves conduct that presents a serious potential risk of physical injury to another," *id.*

■ Determining whether a previous conviction represents a crime of violence necessitates a formal categorical approach. *See DeLuca*, 17 F.3d at 8; *De Jesus*, 984 F.2d at 23;

*United States v. Bell*, 966 F.2d 703, 704 (1st Cir.1992); *Fiore*, 983 F.2d at 3; *see also Taylor v. United States*, 495 U.S. 575, 600, 110 S.Ct. 2143, 2159, 109 L.Ed.2d 607 (1990) (adopting categorical approach for analogous determination under Armed Career Criminal Act); *United States v. Doe*, 960 F.2d 221, 223–24 (1st Cir.1992) (same).[3] As a rule, this type of approach is restricted to an examination of how the legislature has defined the crime, without any concomitant inquiry into the details of the defendant's actual criminal conduct. *See DeLuca*, 17 F.3d at 8; *De Jesus*, 984 F.2d at 23; *Fiore*, 983 F.2d at 3; *see also Taylor*, 495 U.S. at 600, 110 S.Ct. at 2159. Nevertheless, "there are certain limited circumstances in which some investigation beyond the formal nature of the charge may be warranted." *DeLuca*, 17 F.3d at 8 n. 3; *accord Taylor*, 495 U.S. at 602, 110 S.Ct. at 2160; *Doe*, 960 F.2d at 224. For example, if the statutory description is inscrutable, or if it blankets both violent and non-violent crimes, a court may peek beneath the coverlet. *See, e.g., United States v. Harris*, 964 F.2d 1234, 1235 (1st Cir.1992) (employing similar exception in an ACCA case); *see also Taylor*, 495 U.S. at 602–03, 110 S.Ct. at 2160.

These principles inform our treatment of the instant case. Here, the first three avenues to dubbing the 1979 offenses crimes of violence are dead ends; the government concedes—as, indeed, it must—that no count of conviction was for a felony of which physical force is an element, or for a felony listed by name in the career offender guideline, or for a felony involving the use of explosives. Thus, the issue before us hinges on whether any of the counts of conviction, considered from a categorical standpoint, can be said to "involve[ ] conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(1)(ii); *see also* U.S.S.G. § 4B1.2, comment. n. 2(B).

---

2. The parties treat the verdicts that found defendant guilty on these counts as evidencing convictions for each of the four offenses described in the text. We emulate their example. And we sometimes refer to these several crimes, collectively, as "the 1979 offenses."

3. Given the substantial similarity between the Armed Career Criminal Act's definition of "vio-

lent felony," 18 U.S.C. § 924(e)(2)(B), and the Sentencing Commission's definition of "crime of violence," U.S.S.G. § 4B1.2(1), authority interpreting one phrase frequently is found to be persuasive in interpreting the other phrase. *See, e.g., De Jesus*, 984 F.2d at 24 n. 6; *Bell*, 966 F.2d at 704.

## IV.

### Analysis

#### A.

■ The label "racketeering," though pejorative, does not shed much light on whether the activity in question poses (or fails to pose) a serious potential risk of violence. After all, racketeering comes in many shapes and sizes, and covers a wide range of activities. Those activities are uniformly nefarious and almost invariably nasty—but they are not necessarily violent.[4] One is reminded of the label "conspiracy," a label so encompassing that it "says next to nothing about the underlying nature of the crime," and, therefore, gives a court no real insight into whether a conviction bearing the label can be classified as a crime of violence. *Fiore,* 983 F.2d at 3. Since the statutory language describing racketeering, taken alone, tells us so little, we can only conclude that convictions for racketeering sometimes will constitute predicate offenses and sometimes will not. It follows, *a fortiori,* that the same is true vis-a-vis convictions for conspiracy to engage in racketeering.

■ Because crimes of this androgynous sort, not unlike chameleons, "will necessarily take on the characteristics and coloration of [their] environment," *id.* (discussing general conspiracy), some exploration of that environment must be undertaken. Yet, a caveat is in order: even where, as here, the category limned in the statute is an inexact semantic construct, warranting further inquiry, the task of classification continues to demand a categorical as opposed to a fact-sensitive analysis. This means that if previous convictions for racketeering or racketeering conspiracy are in issue, a court seeking to ascertain the appropriateness of predicate offense treatment under *Taylor* principles must ask categorically oriented questions such as: "Racketeering by what means?" "Racketeering to what end?" And in answering these questions, the court should not plunge into the details of a particular defendant's conduct, but, rather, again in fidelity to *Taylor* principles, should merely assess the nature and object of the racketeering activity as described in the indictment and fleshed out in the jury instructions. *See Taylor,* 495 U.S. at 602, 110 S.Ct. at 2160; *De Jesus,* 984 F.2d at 23 n. 5.

This methodology makes good sense, for it cabins further inquiry in keeping with its categorical roots, permitting the court to take a predetermined sample of the earlier case and evaluate its composition without at the same time inviting the judicial equivalent of an archaeological dig. We turn, therefore, to the charging papers and jury instructions in the 1979 case to ascertain the nature and object of the racketeering activity.[5]

#### B.

The earlier indictment identified the "racketeering activity" with which Winter was charged as "horse race fixing," and described the offenses comprising the alleged pattern of racketeering activity as sports bribery, *see* 18 U.S.C. § 224, and travel in aid of racketeering, *see* 18 U.S.C. § 1952(a)(3). This format creates two possible pathways to finding that the 1979 offenses are crimes of violence. We explore each of them.

■ **1. Sports Bribery.** Sports bribery is a discrete, meaningful rubric, itself susceptible of categorical analysis; therefore, we need look no further than the language of the statute.[6] Given that wording, it is certainly *possible* that sports bribery can bring vio-

---

4. The RICO statute makes it unlawful for a person to conduct the affairs of any enterprise affecting interstate commerce "through a pattern of racketeering activity or collection of unlawful debt," 18 U.S.C. § 1962(c), or to conspire to that end, 18 U.S.C. § 1962(d). The statute defines the term "racketeering activity" broadly, *see* 18 U.S.C. § 1961(1), with the result that the term includes activities ranging from murder (perhaps the paradigmatic crime of violence) to wire fraud (a good example of a crime that has never been considered a crime of violence).

5. This analysis does double duty in the present case because it also serves to probe the status of the remaining counts of conviction as crimes of violence *vel non.*

6. The relevant statute criminalizes interstate schemes "to influence, in any way, by bribery, any sporting contest, with knowledge that the purpose of [the particular] scheme is to influence by bribery that contest...." 18 U.S.C. § 224(a).

lence into play—but that is not the critical determinant. A categorical approach is not concerned with testing either the outer limits of statutory language or the myriad of possibilities girdled by that language; instead, a categorical approach is concerned with the usual type of conduct that the statute purposes to proscribe. *See De Jesus,* 984 F.2d at 24. Thus, a court asked to determine whether an offense is (or is not) a crime of violence within the meaning of the "otherwise" clause of the career offender guideline, U.S.S.G. § 4B1.2(1)(ii), must focus on "the degree of risk, expressed in terms of the probability of physical harm presented by the mine-run of conduct that falls within the heartland of the statute." *De Jesus,* 984 F.2d at 24.

Under this standard, the government's argument cannot prosper. Sports bribery, *in general,* simply lacks the "inherent risk of violent outbreak" necessary to justify classifying it as a crime of violence. *Id.* at 25; *see also Fiore,* 983 F.2d at 4 (to come within the crime of violence ambit, a crime, viewed generically, must pose a substantial potential for episodic violence); *Doe,* 960 F.2d at 224–25 (finding "felon-in-possession" convictions not to qualify as predicate offenses under ACCA because such convictions do not usually involve violent conduct). Since there is no sound basis for saying that violence is a normal, usual, or customary concomitant of sports bribery, the crime is not a crime of violence.

**■ 2. *Travel in Aid of Racketeering.*** The statute underlying the Travel Act counts outlaws travel in interstate commerce with intent to—

7. For purposes of the Travel Act, the term "unlawful activity" is defined to include a salmagundi of criminal conduct, ranging from the violent (*e.g.,* arson) to the non-violent (*e.g.,* violation of state liquor laws). *See* 18 U.S.C. § 1952(b)(i)(1)–(3). Bribery is specifically enumerated. *See id.* § 1952(b)(i)(2).

8. Although we have occasionally approved resort to a presentence report in this connection, we have done so only in cases in which the defendant entered a guilty plea, with the result that no jury instructions were available for retrospective review. *See, e.g., Harris,* 964 F.2d at 1235–36; *United States v. Bregnard,* 951 F.2d 457, 459–60 (1st Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992). Because a

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion management, establishment, or carrying on, of any unlawful activity, . . . .

18 U.S.C. § 1952(a).[7] Based on this statute, the government maintains that, because the Travel Act encompasses both violent and non-violent offenses, the court below should have delved into defendant's actual conduct to determine if his offenses constituted crimes of violence. We do not agree.

To be sure, the government is correct in stating that the Travel Act reaches violent as well as non-violent conduct. *Compare id.* § 1952(a)(2) (proscribing travel with intent to "commit any crime of violence to further any unlawful activity") *with id.* § 1952(a)(1), (3) (proscribing generically non-violent conduct). But the statute's breadth does not give an inquiring court license to roam at will through the record of each individual case. Rather, *Taylor* demands that a court poised at such a crossroads consult a limited array of materials—principally the indictment and jury instructions—in determining if the offense can be classified as a crime of violence.[8] *See Taylor,* 495 U.S. at 602–03, 110 S.Ct. at 2160; *see also Harris,* 964 F.2d at 1235; *Doe,* 960 F.2d at 224–25.

In this instance, the permitted review establishes that, under applicable *Taylor* principles, the Travel Act counts do not qualify as crimes of violence.[9] Those counts charged

jury convicted Winter on the 1979 offenses after a full trial, the exception is inapposite here.

9. Counts 22 and 23 of the indictment, which form the basis for the government's contention, in terms charge that Winter violated the Travel Act on two different dates in that he and another caused one Anthony Ciulla "willfully to travel in interstate commerce . . . said defendants intending to promote, manage, establish, carry on and facilitate . . . an unlawful activity, being bribery in violation of Pennsylvania Cons.Stat.Ann. Section 4109, and did thereafter perform, attempt to perform and cause acts to promote, manage, establish, carry on and facilitate . . . an unlawful activity, to wit: affecting by bribery the outcome of pari-mutuel thoroughbred horse races."

Winter with commissioning travel to assist in "effecting by bribery the outcome of ... horse races." Although fixing horse races is antisocial conduct that may on occasion utilize violence as a tool, it does not carry with it an inherent risk of violent outbreak sufficient to merit classification as a crime of violence. In other words, because violence is not a *usual* accouterment of horse race fixing, the degree of risk, expressed in terms of the probability of physical harm, associated with the mine-run of conduct that comprises the heartland of the statute is relatively low. And because that is so, the "otherwise" clause in the career offender guideline, U.S.S.G. § 4B1.2(1)(ii), does not apply.

There is also a second reason why the two Travel Act counts are poor candidates for inclusion as predicate offenses. Neither of these counts invoked the Travel Act generally; their language focused single-mindedly on clause (3), 18 U.S.C. § 1952(a)(3), a subsection of the Travel Act that criminalizes predominantly non-violent conduct, rather than clause (2), 18 U.S.C. § 1952(a)(2), a subsection that criminalizes predominantly violent conduct. To convict on the Travel Act counts, therefore, the jury was required only to find that Winter used bribes to rig horse races and caused Ciulla to travel in aid of the scheme. The charges did not require a finding that the offense involved violence in any way, shape, or form.

The jury instructions bear this out; in briefing the jurors on the Travel Act counts, the trial judge defined those counts in the vernacular of section 1952(a)(3), abjured any suggestion that the counts implicated section 1952(a)(2), and identified bribery as the unlawful activity to which the travel was directed. Because the defendant was charged with and convicted of violating the Travel Act under the statute's non-violent alternative, the Travel Act counts did not serve to transmogrify the 1979 offenses into crimes of violence.

█ **3.** *The Pennsylvania Statute.* The government has another string to its bow.

Because the Travel Act counts mention the violation of a Pennsylvania statute, *see supra* note 9, and that statute includes violent as well as non-violent methods of perpetrating the specified crime,[10] the government hypothesizes that we can explore whether Winter actually conducted the bribery scheme in a brutal manner.

This reasoning is specious. Winter was neither charged with, nor convicted of, violating the Pennsylvania statute; and the indictment does not embrace the language of that statute. *Taylor* and its progeny in no way suggest that a reviewing court should investigate conduct ranging outside the counts of conviction for purposes of determining career offender status. Indeed, the case law teaches the opposite lesson. *See Taylor,* 495 U.S. at 602, 110 S.Ct. at 2160; *Doe,* 960 F.2d at 224; *United States v. Leavitt,* 925 F.2d 516, 517–18 (1st Cir.1991); *see also* U.S.S.G. § 4B1.2, comment. n. 2(B) (explaining that "the conduct of which the defendant was convicted is the focus of inquiry").

Moreover, although the Pennsylvania statute includes a violent method of horse race fixing among the several methods identified therein, the state statute is mentioned only in the Travel Act counts. In turn, those counts, *as charged in the indictment,* by their very wording exclude that violent method, for they are worded exclusively in terms of a non-violent alternative, subsection (a)(3) of the Travel Act, 18 U.S.C. § 1952(a)(3). Thus, the passing mention of the Pennsylvania bribery statute is of no consequence anent the applicability of the career offender guideline.

## V.

### *Conclusion*

Categorically speaking, racketeering, conspiracy to commit racketeering, travel in aid of racketeering, and sports bribery all fail, in the circumstances of this case, to qualify as crimes of violence under the career offender guideline, U.S.S.G. § 4B1.1. Hence, the gov-

---

**10.** In pertinent part, the state statute outlaws the rigging of publicly exhibited contests in circumstances wherein a person "confers ... any benefit upon, or threatens any injury to, a participant, official or other person associated with the contest or exhibition; or (2) tampers with any person, animal, or thing." 18 Pa.Cons.Stat.Ann. § 4109(a).

ernment's claim that assaultive behavior was used to advance Winter's racketeering activities, even if true, is beside the point. We need go no further: although Winter, as the government asserts, may well have demonstrated a penchant for violence, he could not appropriately have been sentenced as a career offender.

*Affirmed.*