**UNITED STATES of America**

v.

**Reginald SHEPARD, Defendant.**

**No. CRIM. 98–10262–NG.**

United States District Court,
D. Massachusetts.

Jan. 23, 2002.

Nadine Pellegrini, United States Attorney's Office, Boston, MA, for Plaintiff.

Linda J. Thompson, Jacobson & Thompson, P.C., Springfield, MA, for Defendant.

## MEMORANDUM RE: RE–SENTENCING

GERTNER, District Judge.

On July 14, 1999, I sentenced Reginald Shepard to 46 months in prison after he pled guilty to a violation of 18 U.S.C. § 922(g) (felon in possession of a firearm).[1] With a criminal history of VI, the presentence report ("PSR") calculated Mr. Shepard's sentencing guideline range to be 30 to 37 months.

The government moved for two enhancements: First, it sought an enhancement to a 15 year mandatory minimum term under the Armed Career Criminal Act ("ACCA") 18 U.S.C. § 924(e)

1. Under 18 U.S.C. § 922(g)(1) ("§ 922(g)(1)"), it is unlawful for a person who has been convicted previously of a felony to possess a firearm.

(" § 924(e)").[2] I rejected that enhancement on the grounds that Mr. Shepard's conviction history did not meet the statutory requirements. I concluded that on the record before me, I could not determine that he had at least "three prior convictions ... for a violent felony or serious drug offense" within the meaning of the statute. 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4.

Shepard was charged with the crime of breaking and entering under Mass. Gen. L. Ch. 266 § 16, which outlines a generic breaking and entering offense, including offenses that qualify as predicate convictions under the ACCA, *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), namely, breaking and entering into a building, and offenses that do not, namely breaking and entering a car or vessel. While police reports attached to the applications for state criminal complaints suggested that at least five of Mr. Shepard's convictions involved a building, those details were not reflected in the complaints themselves. Rather, the complaints tracked the boilerplate language of the statute. Mr. Shepard pled guilty to the complaints.

After ruling against applying the ACCA enhancement, I invited the government to move for an upward departure on the ground that the criminal history score of VI did not adequately reflect the seriousness of Mr. Shepard's criminal history. Since it was clear that Mr. Shepard's record justified an upward departure, I granted the motion.

The sentence which I imposed represented a two level upward departure, from a level 12 base offense level to a level 14, with 46 months being the highest sentence available in the range. My reasons are recorded in *United States v. Shepard*, 125 F.Supp.2d 562 (2000) ("*Shepard I*").

The government appealed. The decision was then vacated and remanded in *United States v. Shepard*, 231 F.3d 56 (1st Cir. 2000) ("*Shepard II*"). The First Circuit found that I had erred in two respects: First, *Shepard I* suggested that the trial court could never use police reports to determine the crime to which the defendant had pled (and therefore, the charge of which he was convicted). Second, *Shepard I* implied that in order for me to find that the defendant had admitted to the predicate offenses, at either the state plea colloquy or during the federal sentencing, the defendant had to admit to the offense *explicitly* ("in the sense of 'yes, I struck the victim in the face,' ") *Shepard II*, 231 F.3d at 66.[3]

---

2. A defendant convicted for a violation of § 922(g)(1) is subject to the sentence-enhancement provision at issue, § 924(e):

    (1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court ... for a violent felony or a serious drug offense, or both ... such person shall be fined not more than $25,000 and imprisoned not less than fifteen years....

    (2) As used in this subsection—...

      (B) the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year ... that—

      (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

      (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

3. It was not my intent in *Shepard I* to imply either position although the decision could be fairly read to suggest these interpretations. I noted repeatedly that the ACCA's emphasis on convictions reflects a concern that facts which determine ACCA status had to have been litigated and subjected to the formalities of the criminal justice process before a defendant's sentence can be dramatically increased. While I confess to overstatement, what I meant by "the formalities" of the criminal

The court directed the consideration of police reports and complaint applications to determine if they "constituted sufficiently reliable evidence of the government and the defendant's shared belief that the defendant was pleading guilty to the unlawful entry of a building." *Shepard II*, 231 F.3d at 70. The court also directed a review of the defendant's submissions at sentencing to evaluate whether, under the circumstances, the defendant admitted that he had pled to the predicate offenses. *Id.* at 66.

At the first hearing on remand, I addressed two issues: First, what was the question to be answered on remand? Was it—what did Mr. Shepard plead to? Or, was it—what did Mr. Shepard do to provoke the charges? Both parties agreed that the answer was: What did Mr. Shepard *plead* to on those prior occasions? Second, with respect to that question, who bears the burden of proof? With some qualifications noted below, both parties agreed that the government bears the burden of proof.

I also considered on remand two types of questions raised by the court—those which related to whether the police report was made part of, referred to, or used in any way in the plea colloquy[4] and those

which related to whether Mr. Shepard admitted that he had pled to the predicate offenses.[5]

After two hearings, myriad briefs, and additional submissions of the parties, I have evaluated the police reports and complaint applications as well as the defendant's affidavit. I concluded that the police reports did not provide reliable evidence on the central question, what did the defendant plead to in the state court? There is no evidence that the defendant and the government "shared [the] belief" that Shepard was pleading guilty to the unlawful entry of a building. *Shepard II*, 231 F.3d at 66.

As I describe below in greater detail, there was no transcript of the state plea colloquy, no presentence report containing the police reports, and no written plea agreement. The only account of the plea process that I have comes from the defendant's affidavit. The government offered no other version—no account from the state prosecutor or any other participant, no recitation of whether it was "standard practice" of the judge to review the report in open court. The defendant indicated that the police reports were never read or mentioned at his plea colloquies. They

---

justice process was that the ACCA's focus was on what the defendant had pled to or been convicted of, and not what he had actually done. (I noted that what the *Taylor* court described as the "categorical" approach, I was calling "focusing on the formalities of the record." *Shepard I*, 125 F.Supp.2d at 568.)

4. The Court noted: "... [D]id the court taking the guilty plea have before it the police reports and complaint applications described in the PSR, or any other documents describing the defendant's conduct? Where did the police reports come from? What took place at Shepard's plea hearings? More specifically ... did the defendant provide anything at his plea hearings to contest the facts set forth in the police reports and complaint applica-

tions, thereby suggesting that the government and the defendant did not share an understanding that he was pleading guilty to an offense that had the elements of a generically violent crime?" *Shepard II*, 231 F.3d at 68.

5. The Court noted: "Shepard's objections to the government's police reports and complaint applications might focus, for example, on any inconsistencies or ambiguities in their description of the defendant's conduct, or any circumstances relating to the creation or reproduction of the documents, that affect their usefulness for determining whether Shepard and the government both believed that an entry into a building was at issue when he entered the guilty pleas." *Shepard II*, 231 F.3d at 69.

were never made a part of the plea process at all, either by way of exhibit or orally. Furthermore, Mr. Shepard points to instances in which the reports were vague or obviously based on hearsay.

Apart from the state plea colloquy, nothing the defendant said at the instant sentencing hearing or in his various court submissions qualifies as an admission that he had in fact pled to the crime of breaking and entering into a building in state court.

While I could not conclude by a fair preponderance of the evidence that Mr. Shepard had pled to the qualifying crimes of violence, I reiterated my conclusion that an upward departure was appropriate. Mr. Shepard's criminal history score, I found, understated the seriousness of his record under U.S.S.G. § 4A1.3, p.s. As a result, I reimposed the original sentence.

## I. FACTS

Mr. Shepard pled guilty to a number of state offenses; at least five have been cited by the government as predicate offenses to ACCA. In each case, the state complaints tracked the Massachusetts statute (Mass. Gen. L. Ch. 266 § 16, 18,)[6] a statute which includes breaking and entering into a building as well as breaking and entering into a ship, vessel or vehicle. Case law under the ACCA identifies only breaking and entering into a building or other structure with intent to commit a crime as a crime of violence under the ACCA. *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). In contrast, breaking and entering into a ship, vessel or vehicle is not a crime of violence under the ACCA. *Id.*

The government introduced certified copies of police reports related to four offenses. In some instances, these reports were made part of applications for complaints. Significantly, the complaints themselves did not reflect the information contained in the reports on the issues relevant to this case; in each case, the complaints just tracked the boilerplate language of the statute.[7]

6. The relevant statutes provide:
Section 16:
> Whoever, in the night time, breaks and enters a building, ship, vessel or vehicle, with intent to commit a felony, ... shall be punished by imprisonment in the state prison for not more than twenty years, or in a house of correction for not more than two and one half years.

Mass. Gen. L. Ch. 266 § 16 (2000).
Section 18:
> Whoever, in the night time, enters a dwelling house without breaking, or breaks and enters in the day time a building, ship or motor vehicle or vessel, with intent to commit a felony, no person lawfully therein being put in fear, shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than five hundred dollars and imprisonment in jail for not more than two years.

Mass. Gen. L. Ch. 266 § 18 (2000). The statute was amended in November 1989 to include the "or motor vehicle" language.

7. The reports were as follows:

> (1) *May 1989 Boston Police Report (paragraphs 58, 59 of the PSR):*
> Responded to R.C. [radio call] to 30 Harlem St. for B & E in progress. On arrival observed cellar door in rear had been broken down. Spoke to victim who [said] she heard noises downstairs. She then observed suspect described above in her pantry.

Consistent with the police report, the complaint *application* states that the defendant was charged with "breaking and entering night" and that the property stolen or destroyed was a "cellar door." But the *complaint* itself says only that, on 5/6/89, the "defendant did break and enter in the night time, the building, ship, vessel or vehicle, the property of Jerry Cothran, with intent to commit a felony therein."

> (2) *March 1991 Watertown Police Report (paragraphs 68, 69 of the PSR):*
> In reference to ... a B & E & L from the FRETTERS store ... reported on 3–11–

Mr. Shepard filed an affidavit on remand.[8] His affidavit focused on each of the police reports, which he reviewed one by one. He indicated that none of the details in these reports were ever mentioned at his pleas. Moreover, he indicated that the reports themselves were never read by the judge to him during the plea colloquy; nor was he ever asked if the information contained in the Incident Reports were true. He noted further that parts of the reports were ambiguous and based on hearsay.[9] He added with respect

> 91 the following is submitted: A follow-up investigation revealed that while the manager ... and the assistant Manager ... were in the back-room to the above buisness [sic] ... they observed the back door open and observed a former employee, Reginal [sic] Shepard ... enter the room. Upon seeing the two managers, the suspect Shepard ran from the room in a northerly direction out the parking lot towards Arsenal street ... According to both employee's [sic] this door was locked and the only way in was with a key which they suspect Shepard had in his possession.

After the incident, the managers did an inventory and found certain equipment missing.

The complaint states that on 3/11/91, the defendant did break and enter in the night time, the building, ship, vessel or vehicle, the property of Fretters, with intent to commit a felony therein.

3) *July 1991 The Boston Police Report (paragraphs 70–71of the PSR):*

> Officers ... responded to a radio call for an S/P wearing red shorts and blue shirt in the hallway of 258 Norwell Street. Upon arrival observed S/P (described above) walking away from above address ... carrying a pink pillowcase ... found pillowcase to contain property listed above ... Officers checked bldg and found a panel on 3d floor front door had been broken in exposing inside door lock. When the officers entered the living room, they 'observed, in living room, areas where V.C.R. and phone were taken from' ... also observed in bedroom one pink pillowcase missing from pillow.

The complaint *application* states the defendant is charged with "b/e daytime" and the place is "258 Norwell St." The *complaint*, however, states that on 7/18/91, "the defendant did break and enter in the day time the building, ship or vessel of Monica Collins with intent to commit a felony therein."

4) *February 1994 Boston Police Report (paragraphs 70–77 of the PSR):*

> [R]esponded to R/C [radio call] for a black male going door to door asking for an unk. person ... [Witness said suspect] went next door to # 145 Gallivan and was observed by the witness attempting to gain entry by turning several door knobs ... [O]fficer ... went to the rear of the property and suspect was observed with both arms through the glass partition (Glass to door was shattered) attempting to gain entry to the second door (near basement.)

The complaint application charges the defendant with "breaking and entering," and "wilful malicious destruction of personal property," at 145 Gallivan Blvd. The complaint stated, "on 2/3/94 the defendant did break and enter in the day time, the building, ship or motor vehicle or vessel of Russell McGaugh with intent to commit a felony therein."

5) *April 1989 (Paragraphs 53–55 of the PSR):* The complaint application suggested that the defendant broke into the Crispus Attucks Children's Center by breaking a window and did put the Director the Center in fear and did take baby food, and certain equipment.

The complaint however, states that on 4/2/89, "the defendant did break and enter in the daytime, the building, ship, or vessel of Crispus Attucks Children's Center with intent to commit a felony therein."

8. At the initial sentencing, the defendant objected to the "recitation of alleged factual information drawn from sources such as police reports and complaint applications," citing *Taylor*. On remand he submitted an affidavit, described above.

9. With respect to the Watertown report, Shepard notes that part of the report is based on the hearsay statements of two employees (that a certain door was locked and "the only way in was with a key they suspect Shepard has in his possession", and that they "believe" upon Shepard's termination he "never turned his stores keys into [sic] the manag-

to each report: "I did not admit the truth of the information contained in the Incident Report as part of my plea and I have never admitted in court the facts alleged in the report are true."

No transcript of the plea colloquy was offered for any of the pleas cited by the government. The government represented that none was available. Likewise, no one offered any presentence reports which might have contained a police report or written plea agreements. There was no evidence suggesting that the police reports had ever been made part of the plea colloquy, in writing or orally.[10]

Apart from Mr. Shepard, no witness described what had occurred at the plea colloquy—no police officers, prosecutors or attorneys. In short, no document was offered rebutting Mr. Shepard's account of what went on.[11]

## II. ANALYSIS

### A. The Question to Be Answered on Remand Is: What Did Mr. Shepard Plead To?

The question on remand, and indeed, the central question under the ACCA is: What did Mr. Shepard plead to? As the First Circuit noted, the question is "not what Shepard did to provoke the criminal charges to which he pled guilty." *Shepard II*, 231 F.3d at 68.[12]

I will briefly review the ACCA case law and statutory language for two purposes— to put the government's arguments in context and to demonstrate the ways in which the government's approach would require me to do precisely what *Taylor* and its progeny forbid.

The ACCA imposes a mandatory sentence of at least fifteen years, and up to life imprisonment for illegal possession of a firearm, by anyone who has three prior convictions for violent felonies or serious drug offenses. The linchpin is the word "conviction." While some judges believed that the "mere" fact of three prior felonies, without more, was not enough to make a career criminal, and hesitated or even refused to send the defendant to jail on that score alone,[13] the language of the Act and

---

er.") The employees did not see Shepard take anything; it was only after an inventory that they realized certain things were missing.

10. A word about plea colloquies in the courts of Massachusetts: The defendant pleads guilty and is usually sentenced immediately. A presentence report is made available only if either party moves for it. *See* Mass. R.Crim. P. 12. There are rarely written plea agreements.

11. In *Commonwealth v. Quinones*, 414 Mass. 423, 608 N.E.2d 724 (1993) for example, a defendant filed a motion to withdraw his plea on the grounds that it was not a knowing and voluntary waiver of his constitutional rights. No transcript of the earlier plea colloquy was available. The vehicle containing the stenographic notes of the court reporter had been stolen. The trial judge denied the motion based on his "practice" in taking and accepting pleas of guilty and his "memory" of the proceedings. *Id.* at 424, 608 N.E.2d 724. The Supreme Judicial Court of Massachusetts

affirmed on the ground that "[i]f the record is unavailable, it may be reconstructed through testimony or other suitable proof of what happened in court when the guilty plea was taken." *Id.* at 432, 608 N.E.2d 724.

12. The First Circuit's question mirrors that of the Supreme Court in *Taylor*. The question in *Taylor* was, "whether, in the case of a defendant who has been convicted under a nongeneric—burglary statute [e.g. one that includes places, such as automobiles and vending machines, other than buildings], the government may seek enhancement on the ground that he *actually committed* a generic burglary." *Taylor*, 495 U.S. at 599–600, 110 S.Ct. 2143 (emphasis added). The Court answered: "No." The categorical approach of *Taylor* looks to what the defendant was convicted of, not what he did.

13. *See, United States v. Wicks*, 833 F.2d 192, 195 (9th Cir.1987), cert. denied, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63(1988) (Preger-

its legislative history was clear: Judges applying the ACCA should confine their identification inquiry to the conviction record—the number, type and timing of prior convictions. *See* James E. Hooper, *Bright Lines, Dark Deeds: Counting Convictions Under the Armed Career Criminal Act*, 89 Mich. L.Rev.1951, 1967 (1991) ("The ACCA contemplates an examination of the conviction record, and little else.") The Supreme Court reaffirmed this in *Taylor v. United States*, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990): "We think the only plausible interpretation of [the ACCA] is that … it generally requires the trial court to look only to the fact of conviction and that statutory definition of prior offense." [14] Calling the methodology the "categorical approach," 495 U.S. at 602, 110 S.Ct. 2143, the Court cautioned the judge against becoming embroiled in a "daunting" factual inquiry about what had actually happened at the time of the state offense,[15] particularly where the state offenses occurred some time ago. *Taylor*, 495 U.S. at 600, 110 S.Ct. 2143. The aim was only to look to the "charging documents," not "plunge into the details of a particular defendant's conduct." *Shepard II*, 231 F.3d 58, 65 (citing *United States v. Winter*, 22 F.3d 15, 19 (1st Cir.1994)).

Where, as here, the state statute to which the defendant pled guilty did not track the federal definitions under the ACCA, the court was obliged to dig further. Nevertheless, the First Circuit has been clear about the limitations of "the dig": The judge may not hold a mini-trial on the particular facts underlying the prior offense, but he or she may "peek beneath the coverlet" of the formal language to ascertain whether the conviction was for a non-violent or a violent crime. *Dueno*, 171 F.3d 3, 5 (1st Cir.1999).

### B. The Government Bears the Burden of Proving What Mr. Shepard Pled To

Plainly, the government bears the burden of "proving the applicability of an upward adjustment under the guidelines

---

son, J., dissenting) ("I would … hold that something more than three convictions is required … Here, where two of the three convictions stemmed from burglaries that occurred on the same night, I would hold that [the ACCA] was not intended to, and therefore does not, apply."); *United States v. Balascsak*, 873 F.2d 673, 683–84 (3d Cir.1989) (Becker, J. concurring) (refusing to enhance the sentence unless the conviction history showed "the crimes (and the episodes of which they were a part) were truly separate").

14. This focus on convictions and the statutory offense definitions under the ACCA is notably different from the methodology for determining criminal history departures under the chapter 4 of the Sentencing Guidelines. Recognizing the inadequacies of the criminal history scoring system, the Sentencing Commission encouraged departures in broad terms—where "reliable information" indicates that the criminal history category "significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3, p.s. "Reliable evidence" can include prior sentences that were not counted in the score, as well as "prior similar adult criminal conduct not resulting in a criminal conviction." *Id.* Police reports may well be an important source of "reliable information" for such departures. As I noted in *United States v. Footman*, 66 F.Supp.2d 83, 93 (D.Mass.1999), aff'd. *United States v. Footman*, 215 F.3d 145 (1st Cir.2000), however, the "reliable information" of "prior similar conduct" raises serious problems of its own.

15. Indeed, the legislative history reflects a concern about broadening the inquiry beyond the conviction record. While some believed a record of conviction might predict recidivism, other factors which a court might take into account were less clear. Hooper, *Bright Lines, Dark Deeds*, 89 Mich. L.Rev. at 1963–64.

[or the ACCA]," *Shepard II*, 231 F.3d at 69 (citing *United States v. Dueno*, 171 F.3d 3, 7 (1st Cir.1999)), and thus, reconstructing the record. If the record is ambiguous, if it does not allow me to say one way or the other what Mr. Shepard agreed to plead to, then the enhancement should not apply.

The court's "peek beneath the coverlet" could involve one of three scenarios. If the defendant was convicted after a trial, the court is permitted to consider the jury instructions to understand what the plea consisted of. *United States v. Damon*, 127 F.3d 139, 142 (1st Cir.1997). If a guilty plea, the court may review the plea colloquy. *Id.* Or the court may review the defendant's statements or pleadings to see if they comprise admissions that the prior pleas were pleas to the predicate ACCA offenses. *United States v. Harris*, 964 F.2d 1234, 1236–37 (1st Cir.1992).

In this case, in order to decide what Mr. Shepard has pled to I must look in two directions: a) reconstructing the plea colloquy, and b) determining whether the defendant's responses (or failures to respond) to the PSR and the police reports attached thereto amount to an admission of the facts recited in the documents.

### C. *Reconstructing the Plea Colloquy*

#### 1. *Relationship of Police Reports to the Plea Colloquy*

The government offered certified copies of the police reports; at least five of these pleas, it suggested, were pleas to a crime of violence, breaking into a building.

The First Circuit has called for careful consideration of those reports. To the question, "may a sentencing court consider certified copies of police reports and complaint applications to determine whether a defendant pled guilty to three prior 'violent felonies' qualifying for sentence enhancement under the [ACCA]," *Shepard II*, 231 F.3d at 58, the answer was plainly, "yes."

But the reverse position, which the government seems to urge, is not appropriate—that certified police reports are *all* that is needed, without proof that they were part of the plea colloquy, that they were exhibits to the colloquy, part of a plea agreement, or referred to by the judge or the prosecutor as part of the factual basis for the plea.

To be sure, the police reports offered by the government were certified. But certification established only that the document was an accurate copy of the police report. It does not answer the question: What did the defendant plead to? *Shepard II*, 231 F.3d at 60 n. 2. Neither does the parties' concession that the police report accompanied the application for a complaint, which made it part of the charging documents. In order to have persuasive evidence of what Mr. Shepard plead to, the police reports must have had some tangible relationship to the plea colloquy. This conclusion is clear from the questions that the Court posed as examples of the kind of inquiries I should make on remand:

A) Did the court taking the guilty plea have before it the police reports and complaint applications described in the PSR, or any other documents describing the defendant's conduct?

B) What took place at Shepard's plea hearings?

C) Did the defendant provide anything at his plea hearings to contest the facts set forth in the police reports and complaint applications, thereby suggesting that the government and the defendant did not share an understanding that he was pleading guilty to an offense that had the elements of a generically violent crime?

D) Where did the police reports come from? [16] *Shepard II*, 231 F.3d at 68.

## 2. *The Record: No Transcripts, State Presentence Reports, or Plea Agreements—Only Shepard's Affidavit*

A review of the plea colloquy would obviously enable me to reconstruct the plea and answer the relevant questions. If the police report had been offered as part of the plea, had been an exhibit to the plea colloquy, or had been orally recited as part of the factual basis of the plea, then I could conclude that Mr. Shepard adopted those facts.

The problem is that there is no record of the plea colloquy. There is no formal plea agreement (to which a police report might have been attached). There was no state presentence investigation which may have clarified the factual basis for this plea. There is no rebuttal offered by the government to Shepard's account of what went on during the plea colloquy.

The only account is Mr. Shepard's, and he insists that the police reports were never mentioned during his pleas. Mr. Shepard's affidavit states unequivocally that the police reports offered here were never made part of the plea colloquy, never explained to him, and never acknowledged by him to be accurate at that time or at any other.

## 3. *The Government's Position Is Inconsistent with United States v. Harris,[17] United States v. Custis,[18] and United States v. Daniels.[19]*

Nevertheless, the government wants the Court to infer that Mr. Shepard pled guilty to the facts contained in the various reports. It suggests that if the police report recited certain facts, namely, what happened and where it happened, and the defendant did not specifically deny those facts, he "must have" pled guilty to them. Or, it implies, since the police report included those facts, it is reasonable for me to assume that everyone—defendant and government—"must have" shared the intent to plead guilty to them. How could Mr. Shepard have pled guilty to breaking and entering at all if he were not pleading to those facts, they suggest? What facts could he have reasonably contested?

These inferences are not only unwarranted in the record; they are troubling. Since I do not know the specifics of what Mr. Shepard actually did (in terms of the crime), or what the state of the evidence against him was, or what other information the officers had, or what he was in a position to contest, in order to adopt the government's position, I would have to speculate about critical issues.

To take the facts as admitted in the police report because the defendant never specifically denied them during the plea would turn the plea process on its head. Mr. Shepard was never *asked* to deny or accept the facts that are of relevance to

---

**16.** To be sure, this question, taken out of context as described below, might suggest that all the government has to do is prove that the report was an accurate copy of the original—i.e., certify the report. As I suggest throughout, that interpretation of *Shepard II* would be inconsistent with the categorical approach. The police reports have relevance only insofar as they were part of the plea process or a federal presentence report to

which the defendant did not adequately object.

**17.** 964 F.2d 1234 (1st Cir.1992).

**18.** 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994).

**19.** 532 U.S. 374, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001).

this federal proceeding. All that I can tell from the record is that he pled to the boilerplate complaint, phrased in terms of the general breaking and entering statute. As a matter of evidence law, this could hardly qualify as an admission.[20]

Indeed, the government's position is tantamount to placing the burden of proof on the defendant, and an extraordinary burden at that. He could dispel the inferences not by saying, "I did not plead to those details," as he has done, but only by saying, "I did not do this or that act as the police report says."[21]

*Taylor* expressly eschews such an approach—evaluating the actual course of conduct which triggered the criminal offense, making factual findings not necessarily ever made by the state court in federal court, and if the particular issues were not litigated in state court, litigating them in federal court. Indeed, the Court adopted the categorical approach even when it recognized the problem presented by the instant case—when a defendant pleads guilty but no record of the plea survived colloquy. *Taylor*, 495 U.S. at 601–02, 110 S.Ct. 2143.

Plea bargains affect guilty pleas that may or may not be on all fours with the charging documents; they are the product of strategic "bargains" after all, based on the sentence offered, the risks of trial, and the state of the evidence. As the Supreme Court noted, "In any case where the defendant pleaded guilty, there is often no record of the underlying facts. Even if the Government were able to prove those facts, if a guilty plea to a lesser, non-burglary offense was the result of a plea bargain, it would seem unfair to impose a sentence enhancement as if the defendant had pleaded guilty to burglary." *Taylor*, 495 U.S. at 601–02, 110 S.Ct. 2143, cited approvingly in *Shepard II*, 231 F.3d at 69–70.

Other courts have confronted similar situations as the instant one and have rejected arguments similar to those made by the government. In *United States v. Shannon*, 110 F.3d 382 (7th Cir.1997), the defendant pled to statutory rape, which could include either consensual intercourse or forcible rape of a minor. While the complaint contained details consistent with the latter, the information to which the defendant pled alleged only statutory rape. The Ninth Circuit looked to the information, holding that "the information was the basis of the conviction and sentence and all its allegations were admitted and must be deemed established, while the complaint contains factual allegations that are contested and would require an evidentiary hearing to confirm." *Id.* at 384. Likewise, in the instant case, I am obliged to review only the indictment, and not the application for the complaint or police reports not made part of the record.

Or, in the case of a jury trial, if the jury instructions were lost, plainly the court is not authorized to review the transcript to determine what the trial "must have been" about or what the jury "must have" con-

---

**20.** The only "admissions" category relevant here would be an "admission by silence." These admissions are admissible on the theory that a person would protest the statement made in his presence if untrue. M. Graham, 3 Handbook of Federal Evidence § 801.21 (5th ed.2001) (describing application of Fed. R.Civ.P. 801(d)(2)). Plainly, nothing that I know about Mr. Shepard's plea colloquy would justify such an inference.

**21.** Even if I were to engage in the inquiry—the "must haves" that the government's analysis invites—I would conclude that these reports are sketchy, at best. With the sole exception of two of them (Watertown 1994, Boston 1991), they reproduce the hearsay accounts of witnesses on the scene.

victed the defendant of. The Supreme Court disapproved of such an approach in *Taylor,* 495 U.S. at 601, 110 S.Ct. 2143.

To be sure, a *"Taylor-type"* review of documents may include more than the charging document. *See e.g. United States v. Maness,* 23 F.3d 1006, 1009–10 (6th Cir.), *cert. denied,* 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994)(reviewing transcript of guilty pleas and indictments to determine whether defendant actually committed generic burglary when he pled guilty to charges that contained all of the elements of a generic burglary); *United States v. Rutherford,* 54 F.3d 370, 372 n. 4 (7th Cir.) *cert. denied,* 516 U.S. 924, 116 S.Ct. 323, 133 L.Ed.2d 224 (1995)("If necessary to resolve an ambiguity in the charging document, the courts may also, in some circumstances, examine the presentence report, plea agreement, or factual findings of the sentencing court"); *United States v. Smith,* 10 F.3d 724, 733–34 (10th Cir.1993)(per curiam)(holding that "a court can look beyond the statutory count of conviction in order to resolve a patent ambiguity caused by a broad state statute"; however, the examination is limited to "the charging papers, judgment of conviction, plea agreement or other statement by the defendant for the record, presentence report adopted by the court, and findings by the sentencing judge.")

But the government has cited no case that suggested that a police report not made part of a plea colloquy, not reflected in the complaint or indictment, and not adopted by the defendant in the presentence report or at any other time can comprise *"Taylor-type"* evidence for the

purpose of determining whether the underlying conviction was for a crime of violence.[22]

A final note: The First Circuit and the Supreme Court have been clear about limiting collateral attacks on convictions during federal sentencing proceedings. *Custis v. United States,* 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994)(holding that with the sole exception of convictions obtained in violation of right to counsel, defendant in federal sentencing proceeding has no right to collaterally attack validity of previous state convictions used to enhance his sentence under the ACCA); *Daniels v. United States,* 532 U.S. 374, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001) (with the sole exception of convictions obtained in violation of right to counsel, motion to vacate, set aside, or correct sentence is not the appropriate vehicle for determining whether a conviction later used to enhance a federal sentence under ACCA was unconstitutionally obtained). If, on the one hand as in *Taylor,* a defendant is not allowed to look below the surface of the plea to demonstrate that he did not *really* threaten anyone, even though the crime to which he pled was an ACCA predicate, then surely the government cannot do the reverse. It cannot look below the surface of the plea to show that even though the plea was to the general offense of breaking and entering and even though nothing else apparently was discussed, what was *really* going on was a plea to a violent crime.

In conclusion, in answer to the specific remand questions: According to the defendant's affidavit and uncontradicted by any

22. I have found reference to the use of a police report as an independent piece of evidence, not as part of a formal proceeding or an admission in one case, *United States v. Richardson,* 230 F.3d 1297 (11th Cir.2000). In *Richardson,* the court found that a police report was reliable evidence to determine tim-

ing of offenses—to operationalize the statutory requirement that the three previous convictions be "committed on occasions different from one another" rather than be part of the same criminal episode. The issue in *Richardson*—the timing of offenses—is not easily determined by *Taylor's* categorical approach.

other evidence, the court taking the guilty plea did not have before it the police reports and complaint applications described in the PSR or any other documents describing the defendant's affidavit. At Mr. Shepard's plea hearing, no one mentioned the police reports or the details comprised therein. The defendant did not contest the facts in the police reports and complaint application because the issues never came up. The police reports apparently come from the application for the complaint. There is no indication that they were ever made part of the record of the plea colloquy.

The government has failed to meet its burden of proof with the submission of the police reports.

### D. Did Shepard Admit That He Had Pled Guilty to a Crime of Violence Whether in the State Plea Colloquy or in this Proceeding?

■ Case law suggests that, in addition to trying to reconstruct the circumstances of the plea or the conviction, the government could establish what the defendant pled to through his or her admissions. *Dueno*, 171 F.3d at 6 (sentence defendant only for those specific "prior crimes of which he was convicted by a trier of fact or by his own admission.") But if the central question is—what did the defendant plead to?—then it follows that the relevant admission need be similarly focused—an admission with respect to the subject of his guilty pleas, and not admissions about whether the defendant committed the underlying crime. The inquiry is still plea-focused. It is not about whether the defendant did the underlying crime. *Shepard II*, 231 F.3d at 66 ("the court's determination *about the meaning of the guilty plea* can be made on the basis of sufficiently reliable evidence independent of a fact-specific admission.... *Harris* and *Dueno*

leave open the question of what documents are sufficiently reliable evidence for determining *whether a defendant's plea of guilty constitutes an admission* to a generically violent crime") (emphasis added).

#### 1. Objecting to the Presentence Report

The presentence report lists the defendant's convictions. Beneath each line describing the conviction, the probation officer typically includes a description of the offense from the police report. If the defendant did not object to that portion of the presentence report, presumably he or she would be admitting that the convictions as described in the PSR are accurate—not just the fact of the convictions, but their nature as well.

That is what occurred in *United States v. Harris*, 964 F.2d 1234 (1st Cir.1992). The Court characterized the holding in *Harris* as concluding that the PSR was "a reliable source for establishing *whether the defendant pled guilty to a violent crime* because the basic facts alleged in the PSR—i.e., that the defendant perpetrated a violent assault—were 'uncontested and uncontradicted.'" *Shepard II*, 231 F.3d at 65 (emphasis added). Since the PSR was uncontradicted, it was reasonable to conclude that both defendant and the government believed that the plea amounted to a plea to the generically violent crime.

In *Dueno*, the court found that the trial court erroneously concluded that the predicate offense was the violent version, breaking and entering a building, rather than the non-violent version, breaking an entering a car or boat, when the complaint to which the defendant pled could comprise either. Rather than remanding the case for additional fact findings, the government urged the court just to look to the PSR, as it had done in *Harris*, since the defendant never objected to it. The PSR

characterized the offense in question as the violent version, breaking and entering a building.

The court refused, unwilling to engraft a finding of that seriousness to Dueno's failure to object to the PSR, because Dueno's failure to object to the PSR's account, the court found, was not enough to "ground a finding that [he] pleaded guilty to breaking into and entering a building." *Shepard II,* 231 F.3d 66 (quoting from *Dueno,* 171 F.3d at 7). A remand was ordered, in which the court pointed out several issues that the trial court needed to resolve.

The court's language is telling. Two of the problems the court noted related to the record before the judge who accepted Dueno's state plea. The evidence "did not include 'a single document that was before the judge who accepted Dueno's plea,' [and] there was no account of what took place at Dueno's plea hearing." *Shepard II,* 231 F.3d at 66.

But the court also mentioned, and this is the point the government emphasizes, that a third problem with the *Dueno* record was that the PSR included facts that were taken from the police report, but the record did not include the report itself.

From that general suggestion on the *Dueno* remand, the government makes two arguments: First, *all* that the government needed to do in order to meet the requirements of the ACCA, and the First Circuit case law, was to produce the certified police report to supplement the PSR. Second, once the government does so, the burden then shifts to the defendant to show the ACCA enhancement does not apply.

The government has taken the police report discussion in *Dueno,* later repeated in *Shepard II,* out of context. A certified copy of the police report may show that the PSR accurately describes what the

police said in the police report and application for a complaint, and may be taken as an admission to the predicate offense—*if there is no objection from the defendant.* But *if the defendant objects,* as here, the police report alone cannot be used to establish what the defendant pled to or comprise an admission to the predicate offense.

To be sure, the court in *Shepard II* faulted Mr. Shepard's initial objections. Plainly, "any objection posed by a defendant at the time of sentencing to the facts set forth in a PSR" is not enough to keep a court from finding that the guilty plea constituted an admission to those facts. *Shepard II,* 231 F.3d at 68. All that Mr. Shepard said in his initial objections was that any description of the convicted offenses, beyond the language of the charging documents, is inappropriate under the ACCA.

But Mr. Shepard elaborated on his objections during the re-sentencing proceedings. His affidavits focused on each of the police reports. He indicated that none of the details in these reports were ever mentioned at his pleas. Moreover, he indicated that the reports themselves were never brought up. He noted further that parts were ambiguous and based on hearsay.

The government suggests that Mr. Shepard's additional affidavits are irrelevant at best, inadequate at worst. The only way the government can come to this conclusion is if it asked a different question—the very question which the United States Supreme Court and the First Circuit expressly do not ask. The only adequate response, according to the government, would be for the defendant to say— "I did not do the things described in the police report"—or else the facts of the report will be deemed admitted. Under this approach, it would not be enough for the defendant to say, as Mr. Shepard said

here—"I did not plead to those facts because they were not brought up at my plea colloquy."

If what he actually did is the test, as the former response suggests, then this area of the law has come full circle. The defendant says: "I didn't do what the presentence report of convictions said I did" or "I did not do what the police report said I did." The government rebuts, and then I have a trial in my courtroom of state court offenses dating from years ago, the very "archeological dig" that the case law rejects.

Plainly, there are problems with the categorical approach; the enhancement does hinge on the "happenstance of state court record-keeping practices." *Shepard II*, 231 F.3d at 67. But that is unavoidable even if police reports, complaint applications, and other documents are considered. Defendants will always get a windfall when the police lose the police report or other underlying documentation. Any standard which, as in *Harris* and *Taylor*, seeks to reconstruct the record necessarily depends on the comprehensiveness of that record.

The Ninth Circuit had to address this in *United States v. Parker*, 5 F.3d 1322 (9th Cir.1993). Parker was found guilty of felon in possession of a firearm. The government sought to enhance under the ACCA, based in part on a 1968 conviction. The 1968 charging instrument noted that Parker and a co-defendant "enter[ed] a residence ... with intent to commit theft therein," a violent felony under 18 U.S.C. § 924(e)(1). Parker, however, was convicted of the charge before a jury, but no jury instructions were available. The question was whether the court could look at the charging paper alone to determine the nature of the conviction when jury instructions were unavailable.

In a prior case, where the jury instructions were not available, the court held that the verdict form could be analyzed in connection with the charging paper. *United States v. Alvarez*, 972 F.2d 1000, 1005–1006 (9th Cir.1992) (where the charging instrument included allegations of the elements of generic "burglary" and the verdict stated that the jury found the defendant guilty "as charged in the information," there was enough evidence to establish that the conviction constituted burglary under section 924(e)).

But in *Parker*, the verdict form provided no information regarding the facts found by the jury. It merely referred to the statutory provision which had been phrased in generic terms. Thus, the court found that reliance on the "charging paper alone" to make the determination under the ACCA was not appropriate. *Parker*, 5 F.3d at 1327

And it added:

> Ultimately, whatever rule were adopted, someone—either criminal defendants or the government—would benefit from the loss or destruction of jury instructions.... Because we can assume that the problem of lost or destroyed instructions will affect primarily older convictions rather than recent ones, the rule we adopt is consistent with the general sentencing principle that he passage of time should dilute—and not magnify—the effect of past conduct on punishment for present acts.

*Id.* at 1328.

Surely the most reliable indicator of what the plea was about was the transcript and exhibits. But as the court noted, there are other ways of establishing the predicate offenses. A defendant may admit to the ACCA predicate or may be taken to have admitted to it through his failure to object to the PSR, as supplemented by a certified police record. The parties could reconstruct the plea through

other means—the prosecutor's affidavit about what his usual practice was, the police officer who was present, etc.

But when a defendant denies that those police reports were part of the plea process and objects to probation's characterization of the offenses in the PSR, the government has to prove that there were predicate ACCA *convictions*. It has not done so here.

## III. *CONCLUSION*

On this record, given this case law, I cannot conclude by a fair preponderance of the evidence that Reginald Shepard has been convicted of "at least" three crimes of violence under the ACCA.

Therefore, the original sentence I imposed on July 14, 1999 (46 months on Count I), was re-imposed on January 11, 2002, for the reasons stated above.

**SO ORDERED.**